The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
September 20, 2018

## 2018COA140

**No. 17CA0851, *Schulte v. Colorado Department of Revenue* —
Vehicles and Traffic — Regulation of Vehicles and Traffic —
Alcohol and Drug Offenses — Expressed Consent for the Taking
of Blood, Breath, Urine, or Saliva**

A division of the court of appeals considers whether the

Colorado Supreme Court's holding in *Gallion v. Colorado*

*Department of Revenue*, 171 P.3d 217 (Colo. 2007), established a

four-part test for hearing officers to apply in every relevant case to

determine whether a law enforcement officer had disengaged from

the process of requesting or directing the completion of a chemical

test under Colorado's express consent law before a driver attempted

to retract an earlier refusal of such test.  § 42-4-1301.1, C.R.S.

2018.  The division concludes that *Gallion* did not establish such a

test.

Because the hearing officer properly applied *Gallion* in concluding that the driver's attempt to retract his initial refusal to submit to a chemical test was untimely as a matter of law, the division affirms the judgment of the district court.

COLORADO COURT OF APPEALS								2018COA140

Court of Appeals No. 17CA0851
Kit Carson County District Court No. 16CV30032
Honorable Kevin L. Hoyer, Judge

Matthew Schulte,

Petitioner-Appellant,

v.

Colorado Department of Revenue, Division of Motor Vehicles,

Respondent-Appellee.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE BERNARD
Welling and Casebolt*, JJ., concur

Announced September 20, 2018

Cure & Bain, P.C., Joseph B. Bain, Jeffrey M. Cure, Burlington, Colorado, for
Petitioner-Appellant

Cynthia H. Coffman, Attorney General, Jennifer Gilbert, Assistant Attorney
General, Denver, Colorado, for Respondent-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1     A deputy sheriff contacted a driver, petitioner, Matthew Schulte, and asked him to submit to a chemical test under Colorado's express consent law.  § 42-4-1301.1, C.R.S. 2018.  The driver refused.  The deputy later arrested him, drove him to jail, turned him over to booking officers, and drove back to the scene.  When the deputy returned to the jail, he completed the license revocation paperwork and began to serve the driver with the notice of revocation.  Before he could do so, the driver asked to take a test.  The deputy told him that it was too late.

¶ 2     The issue in this appeal involves *Gallion v. Colorado Department of Revenue*, 171 P.3d 217, 218 (Colo. 2007), in which our supreme court held that a driver should be allowed to retract an initial refusal as long as "the officer with probable cause remains engaged in the process of requesting and directing the completion of the chemical test."  Did *Gallion* establish a four-part test for hearing officers to apply in every relevant case to determine whether law enforcement officers had disengaged from the process of requesting or directing the completion of a chemical test under Colorado's express consent law before licensees attempted to retract their refusals of such tests?  The driver thinks so.  We do not.

¶ 3     In this appeal, the driver asks us to review a district court's judgment upholding the revocation of his driving privileges. We conclude that the driver's attempted retraction of his initial refusal was untimely as a matter of law. As a result, we affirm the judgment.

I.     Background and Procedural History

¶ 4     Someone reported a car parked in the middle of a field to the police. When an officer arrived, he found the driver asleep in the car, and the car's engine was running. The officer thought that the driver was intoxicated because he could smell a strong odor of an alcoholic beverage.

¶ 5     The field was in an unincorporated part of the county, so a sheriff's deputy arrived a few minutes later to investigate the possible alcohol-related driving offense. The deputy also noticed the odor of an alcoholic beverage, so he asked the driver how much he had imbibed that night. The driver responded, "[N]ot much at all."

¶ 6     The deputy saw that the driver's eyes were bloodshot, and he heard the driver slur his words. He asked the driver to perform some voluntary roadside maneuvers. The driver did not perform

them like a sober person would have performed them, so the deputy asked the driver to blow into a portable chemical testing device. The driver declined.

¶ 7 Based on his observations, the deputy arrested the driver for driving under the influence. The deputy handcuffed him and put him in the patrol car.

¶ 8 The deputy then advised the driver of Colorado's express consent law. The deputy asked him to choose between a chemical test of his breath or of his blood. The driver replied, "No test." The deputy then read him another statement "to give him another chance not to refuse [and] telling him the consequences of what would happen if he did refuse the test."

¶ 9 After the driver refused the deputy's offer of a chemical test, the deputy drove him to the jail. The deputy turned the driver over to the jail staff, and he began working on paperwork related to the case. About half an hour later, the deputy returned to the field, searched the driver's car, and arranged for a tow truck to pull the car from the field and impound it.

¶ 10 After returning to the sheriff's office, which shared the same building with the jail, the deputy finished writing his report. He

then took the "Express Consent Affidavit and Notice of Revocation" to the driver to have him sign it. (When we discuss this form, we will refer to it simply as "the notice.") Before he signed the notice, the driver asked to take a blood test. The deputy told him that "it was too late" because "he had already refused."

¶ 11 Some days later, the driver asked the Division of Motor Vehicles for a hearing at which he could contest the revocation of his driving privileges.

¶ 12 The deputy and the driver testified at the hearing. Their testimony conflicted about how much time had elapsed between when the deputy left the jail to drive back to the field where the driver's car remained and when the driver tried to retract his refusal.

¶ 13 The deputy testified that he

- drove back to the field at 5:35 a.m., which took approximately eight minutes;
- spent about twenty minutes there;
- drove directly back to the sheriff's office; and

- checked the driver's driving record and worked on paperwork for about an hour and forty minutes before he gave the notice to the driver.

¶ 14 The driver testified that only about thirty minutes had elapsed between the time when the deputy left the jail to drive to the field and the time when the deputy served him with the notice.

¶ 15 The hearing officer revoked the driver's driving privileges, deciding that (1) the driver drove a motor vehicle at 4:20 a.m.; (2) the deputy had probable cause to ask the driver to perform a test; (3) the deputy properly advised the driver of Colorado's express consent law; (4) the driver refused to take a test; and (5) the driver did not "properly recant [his initial] refusal."

¶ 16 But the hearing officer's findings did not resolve the conflicting timelines or definitively establish whether the driver had asked to take the blood test "such that the sample . . . [could] be obtained within two hours of . . . driving." § 42-4-1301.1(2)(a)(III). In his oral ruling, the hearing officer described the conflicting testimony, but he never made a credibility determination about whom he believed. *See Long v. Colo. Dep't of Revenue*, 2012 COA 130, ¶ 7 ("The credibility of witnesses . . . and the resolution of conflicting evidence

are factual matters solely within the province of the hearing officer . . . ."). Likewise, the hearing officer's written order only stated that "[w]hether [the driver retracted his refusal] within two hours of the time of driving is a point of dispute in the testimony."

¶ 17 The driver petitioned for judicial review in the district court. The district court upheld the revocation, ruling that the driver's attempted retraction of his initial refusal was untimely because the driver's "offer to take the blood test occurred more than two . . . hours after his arrest."

## II. Standard of Review

¶ 18 A reviewing court may reverse the hearing officer's final judgment if the hearing officer "exceeded . . . constitutional or statutory authority, made an erroneous interpretation of the law, acted in an arbitrary and capricious manner, or made a determination that is unsupported by the evidence in the record." § 42-2-126(9)(b), C.R.S. 2018. "A hearing officer's finding of fact is arbitrary and capricious if the record as a whole shows there is no substantial evidence to support the decision." *Fallon v. Colo. Dep't of Revenue*, 250 P.3d 691, 693 (Colo. App. 2010). When reviewing the hearing officer's decision, we are in the same position as a

district court.  *Gilbert v. Julian*, 230 P.3d 1218, 1221 (Colo. App. 2009).  We review the officer's and the district court's conclusions of law de novo.  *Fallon*, 250 P.3d at 693.

## III.   Discussion

¶ 19     The driver offers two reasons why he thinks that the hearing officer and the district court erred when they decided that his retraction of his refusal was untimely.

¶ 20     First, he asserts that the hearing officer erroneously interpreted section 42-2-126(9)(b) when he decided that, as a matter of law, the driver's retraction was untimely.  We address this assertion below.  After doing so, we affirm the district court's judgment because we conclude that the facts in the record supported the hearing officer's determination that the driver's attempted retraction of his initial refusal was untimely as a matter of law.  *See Makeen v. Hailey*, 2015 COA 181, ¶ 21 (an appellate court may affirm the district court's decision on any grounds supported by the record).

¶ 21     The driver's second contention is that the district court erred when it decided that the driver's retraction occurred more than two hours after he had driven the car.  *See* § 42-4-1301.1(2)(a)(III).  We

7

do not need to address this issue because our resolution of the first assertion provides a sufficient ground to uphold the revocation of the driver's driving privileges.

### A. Law

¶ 22　　Colorado's express consent law requires a driver to take a blood or a breath test if "so requested and directed by a law enforcement officer having probable cause to believe that the person was driving a motor vehicle [while intoxicated]." § 42-4-1301.1(2)(a)(I).　A person "must cooperate" with the request, "such that the sample of blood or breath can be obtained within two hours of the person's driving." § 42-4-1301.1(2)(a)(III).

¶ 23　　Section 42-2-126, which we shall call "the revocation statute," allows the Department of Revenue to revoke a person's driver's license for refusing to complete a test. § 42-2-126(3)(c).　If a law enforcement officer determines that a person has refused to submit to a test, the officer "shall personally serve a notice of revocation on" him or her. § 42-2-126(5)(b)(I).　After serving notice, the officer must "take possession of any driver's license . . . that the person holds." § 42-2-126(5)(b)(II).

¶ 24    Our supreme court interpreted the express consent law and the revocation statute in *Gallion v. Colorado Department of Revenue*, 171 P.3d 217 (Colo. 2007); *see also Edwards v. Colo. Dep't of Revenue*, 2016 COA 137, ¶ 25 (the express consent law "provides the authority for an officer to" request a test, and "the revocation statute provides the consequences" for refusing).  In *Gallion*, the licensee asserted that she had retracted her initial refusal in a timely fashion because she later said, within two hours of driving, that she would submit to a chemical test.  171 P.3d at 222.

¶ 25    In that case, a police officer stopped the licensee because she had been driving erratically.  *Id.* at 218.  The officer arrested her for driving under the influence, and he read her the express consent advisement.  *Id.*  She replied that "she did not understand the advisement," so the officer repeatedly explained it.  *Id.*  The officer eventually decided that the licensee understood the advisement but that she was feigning a lack of comprehension "to interfere with the investigation."  *Id.*  So "[h]e deemed her actions a refusal," and he drove her to the jail.  *Id.*

¶ 26    At the jail, the officer turned the licensee over to the jail staff for booking.  *Id.*  He gave her the notice of revocation, which she

9

signed, and she surrendered her driver's license to him. *Id.* at 218-19. The deputy then "left [the jail] to resume duty." *Id.* Later, but before the two-hour window had expired, the licensee asked a jail deputy if she could take the test. *Id.* The deputy denied the request. *Id.*

¶ 27 Our supreme court held that a retraction of an initial refusal is untimely, even if it occurs within the two-hour window, if a driver does not cooperate with testing "while the officer with probable cause remains engaged in the process of requesting and directing the completion of the chemical test." *Id.* at 218.

¶ 28 Based on those facts, the supreme court decided that "the time period during which the driver must show cooperation" had ended because "the officer ha[d] requested the test, determined that the driver [wa]s refusing testing, completed his duties prescribed by statute to deal with a refusal, and left the presence of the driver." *Id.* at 222.

## B. Analysis

¶ 29 The driver's contention goes like this: (1) *Gallion* established a specific protocol with four steps (request, refusal, completion of officer's duties, leaving the presence of the driver); (2) all four steps

10

must be satisfied before a retraction made within the two-hour window can be considered untimely as a matter of law; (3) the third step — completion of the officer's duties — includes service of the notice; and (4) because the attempted retraction in this case occurred before the deputy had completed his duties, the hearing officer erred when he concluded that the attempted retraction was untimely as a matter of law.

¶ 30     Because we disagree with the driver's characterization of *Gallion*'s holding, we conclude that the hearing officer did not make "an erroneous interpretation of the law."  § 42-2-126(9)(b).

¶ 31     In *Gallion*, the supreme court held that the express consent law requires licensees to "timely cooperat[e]."  171 P.3d at 222.  To do so, the licensee must agree to submit to a test "while the officer remains engaged in requesting or directing the completion of the test."  *Id.*  If a licensee does not offer to retract an initial refusal "while the officer remains engaged in requesting or directing the completion of the test," then the attempted retraction is untimely as a matter of law.  *Id.* at 222-23.

¶ 32    But the supreme court did not set out a strict four-part test based on particular factors.  The court was instead focused on resolving the appeal in light of the facts of the case.

¶ 33    For example, the court never said that, as the final act of disengaging from the process of requesting or directing a chemical test, an officer must serve the licensee with a notice.  Rather, the court decided that, once the officer in that case had served the notice and resumed his patrol duties, he had no obligation to return to the jail facility so that the licensee could complete a test, even if time remained in the two-hour window.

¶ 34    Under those facts, the supreme court decided that the licensee had "failed to timely cooperate and thus refused testing as a matter of law." *Id.* at 223.  We therefore conclude that service of the notice can be *sufficient* for a law enforcement officer to disengage from requesting or directing a chemical test but that it is not a *necessary* predicate to disengaging.

¶ 35    We further conclude, for the following reasons, that the hearing officer's determination that the driver did not cooperate with the deputy while the deputy was engaged in requesting or directing the chemical test was supported by substantial evidence.

12

*See id.* at 222; *Fallon,* 250 P.3d at 696. The driver's retraction of his refusal was therefore untimely as a matter of law.

¶ 36    First, the record supports the hearing officer's finding that the driver refused a chemical test before the deputy drove him to the jail. *See Alford v. Tipton,* 822 P.2d 513, 516 (Colo. App. 1991)(noting that refusal is "based solely on the objective standard of the driver's external manifestations of willingness or unwillingness to take a test"). The deputy testified that he read the express consent law, asked the driver to choose a test, and the driver replied, "No test."

¶ 37    Second, the deputy provided the driver with more than one opportunity to take the test before he drove him to the jail. After the driver's initial refusal, the deputy read him a second statement "to give him another chance" to comply with the express consent law. This statement told the driver of "the consequences of what would happen if he . . . refuse[d] the test."

¶ 38    Third, the driver's initial refusal was "an outright refusal," not "a refusal by noncooperation." *Gallion,* 171 P.3d at 220; *see also Haney v. Colo. Dep't of Revenue,* 2015 COA 125, ¶ 18 (a driver's request to speak to an attorney is considered a refusal by

noncooperation); *Poe v. Dep't of Revenue*, 859 P.2d 906, 908 (Colo. App. 1993)(the driver's silence constituted a refusal by noncooperation). If a licensee does not give a definitive answer about whether he would like to participate in a chemical test, it may be reasonable to assume that he did not know for certain that the officer had deemed some uncooperative statement or act to be a refusal. *See Gallion*, 171 P.3d at 218. In those potentially ambiguous circumstances, a licensee may only realize that he had refused when the officer delivers the notice. *See id.* at 218-19. But, in this case, the facts do not suggest any such ambiguity because the driver said "[n]o test" after the deputy offered him one.

¶ 39    Fourth, the record does not provide any evidence to suggest that the driver had tried to retract his initial refusal before the deputy drove him to the jail or that he had quickly become unsure of his initial refusal and promptly wanted to reconsider it. *See id.* at 219; *Zahtila v. Motor Vehicle Div.*, 39 Colo. App. 8, 9, 560 P.2d 847, 848 (1977).

¶ 40    Fifth, although it may have been possible for the driver to retract his refusal before the deputy turned him over to the jail staff for booking, the record does not suggest that the driver tried to do

so. *Gallion*, 171 P.3d at 222. The driver does not provide any legal authority, and we have not found any, that places a burden on a law enforcement officer to repeatedly check with a licensee who has unequivocally refused a test, especially after the officer has turned the driver over to a jail's booking staff. *See Gallion v. Colo. Dep't of Revenue*, 155 P.3d 539, 544 (Colo. App. 2006)(the driver has the burden to cooperate with testing), *aff'd*, 171 P.3d 217 (Colo. 2007). In this case, from the deputy's perspective, he "had no reason to speak to [the driver] until [his] report was done" because "[the driver] had already refused."

¶ 41     Sixth, after the deputy turned the driver over to the booking staff, he left the driver's presence to resume other duties. *Gallion*, 171 P.3d at 222. The driver contends that the "deputy was still engaged in the investigation and related duties concerning" the driver's license revocation. Not so. Rather, the vast majority of what the deputy did after turning the driver over to the jail dealt not with the revocation, but with the investigation of criminal charges against the driver. The deputy wrote a police report, inventoried the items in the vehicle, and took pictures of some of those items as part of the criminal investigation. He also had public safety matters

to attend to that were unrelated to the revocation, such as overseeing the tow truck that pulled the driver's car out of the field.

¶ 42 Seventh, the deputy only reengaged the driver, for the final time, to have him sign the notice. At this point, the deputy had already asked the driver to submit to a chemical test, heard the driver's refusal, left the driver's presence for an appreciable length of time, and completed all the paperwork associated with the refusal and the revocation.

¶ 43 The judgment is affirmed.

JUDGE WELLING and JUDGE CASEBOLT concur.